**SPENCER DEVELOPMENT COMPANY, a Corporation, et al., Appellees,**

v.

**INDEPENDENT SCHOOL DISTRICT NO. I–89, et al., Appellants.**

No. 62134.

Supreme Court of Oklahoma.

July 21, 1987.

Fenton, Fenton, Smith, Reneau & Moon by Ronald L. Day, Oklahoma City, for Independent School District I–89.

Asst. Dist. Atty., Phyllis L. Walta, Oklahoma City, for Phillip White, County Superintendent of Schools.

Smith and Murdock by Gomer Smith, Jr. Oklahoma City, for Developer and Homeowners.

Howell & Webber by James B. Croy and James F. Howell Midwest City, for Independent School District I–52.

KAUGER, Justice.

The two questions presented on appeal are: 1) whether the trial court has authority to redraw a boundary line between two school districts; and 2) whether public policy estops the Oklahoma City School District from compelling the attendance in the Oklahoma City School District of pupils, who have attained *de facto* status as students in the Mid-Del School District. We find that the district court is precluded by 70 O.S.Supp.1985 § 7–101 [1] from redrawing school district boundary lines, and that the Oklahoma City School District is estopped by our recent decision in *Burdick v. Independent School Dist.*, 702 P.2d 48 (Okla. 1985), from requiring the transfer of students from school district I–52 to school district I–89.

## FACTS

In 1933, the Oklahoma County Superintendent of Schools annexed a twenty acre tract of land from what is now Mid-Del Independent School District and incorporated the tract into what is now the Oklahoma City Independent School District. Until 1979, this tract was undeveloped farm and ranch land. In 1978, the developer, Gary Spencer, decided to build luxury homes on the tract, calling it Sun Country Estates. The Mid-Del District, relying upon a map prepared by Mid-Del, advised the developer that the entire addition was located within the Mid-Del School District. After platting

---

1. Title 70 O.S.Supp.1985 § 7–101 provides in pertinent part:
    "The territory comprising all or part of a school district may be annexed to an adjacent school district, or to a school district in the same transportation area authorized to furnish transportation, or to two or more such districts, when approved at an annexation election called by the county superintendent of schools, but an annexation election may not be held unless the boards of education of the affected districts concur therein. Provided, that such concurrence of the boards of education affected shall not be required in cases of mandatory annexation by the State Board of Education: ..."

the property, the developer was notified in the summer of 1980, that the Oklahoma County Assessor was changing the assessment of ad valorem taxes on the northern half of Sun Country Estates from the Mid-Del District to the Oklahoma City District, based upon an examination of the 1978 official school district map. Before any homes were built, the Oklahoma City District told the developer that the northern half of Sun Country Estates was within the Oklahoma City District based on the official school district map published by the County Superintendent of Schools. However, the County Assessor's Office subsequently changed the distribution of ad valorem taxes back to the Mid-Del District without notifying the Oklahoma City District.

During July of 1980, the two school districts attempted to negotiate a trade of the northern half of Sun Country Estates for another area within the Mid-Del District. The negotiations were unfruitful, and the northern half of Sun Country Estates remained in the Oklahoma City District. As a practical matter, while the area remained a part of the Oklahoma City district, the ad valorem taxes collected were distributed to Mid-Del. The first home in the northern half of Sun Country Estates was sold in August of 1980. The developer admits that he advertised and represented to the buyers that these homes were in the Mid-Del District. Thirty-five homes were sold, and sixteen of these home owners have children who were enrolled in the Mid-Del schools.

In September of 1983, in an effort to resolve a different part of the boundary line between the two districts arising from another case, an attorney for the Oklahoma City District and the Superintendent of the Mid-Del District drove through the northern section of Sun Country Estates. The attorney was told that the children there were attending Mid-Del schools. This was the first notice received by the Oklahoma City District that students from its district were attending Mid-Del schools. A protest was lodged immediately by the Oklahoma City School District, and the Oklahoma County Tax Assessor and the County School Superintendent determined that these homes were in the Oklahoma City District. The Superintendent for the Mid-Del School Systems attempted to trade part of its district for the disputed area, but the Oklahoma City School System rejected the offer. After the two districts were unable to reach an agreement, the attorney for District I–89 wrote to the homeowners advising them that their children were improperly enrolled in the Mid-Del Schools, and that they would be required to enroll in the Oklahoma City public schools before September 4, 1984. (However, on appeal District I–89 conceded that the children currently attending Mid-Del Schools should be allowed to remain in those schools.)

The affected homeowners and the developer sought a permanent injunction in the Oklahoma County District Court to prevent student transfers. They also requested that the court redraw the boundary between the two school districts, annexing the northern half of Sun Country Estates into the Mid-Del District. It was stipulated at trial that the disputed tracts fall within the Oklahoma City School District, and that the homeowners relied on the representations of the Mid-Del District and of the developer that the homes were located in the Mid-Del District. The trial judge decided that the equities were in the favor of the homeowners, redrew the boundary between the two school districts, and annexed the disputed area to the Mid-Del School District. The Oklahoma City School District appeals.

I.

## PURSUANT TO 70 O.S.Supp.1985 § 7–101 SCHOOL DISTRICT BOUNDARIES MAY NOT BE REDRAWN BASED ON EQUITABLE CONSIDERATIONS.

■ The annexation and change of school district boundaries is statutory, not equitable. The legislature, pursuant to 70 O.S.Supp.1985 § 7–101, has set the standards to change school district boundaries

disregarding equitable considerations.[2] A review of the Okla. Const. art. 13, § 1 [3] reveals a "textually demonstrable constitutional commitment" [4] of the issue of public education to the state legislature. Because the legislature has plenary power to create, abolish or change school districts,[5] a court's review of school district boundaries is limited to whether the proper statutory procedures were followed when the boundary was created,[6] or whether the legislature exercised its authority arbitrarily or capriciously.[7] The legislature's wisdom in failing to make the procedures for changing a school boundary less restrictive, is beyond the scope of judicial inquiry.[8]

Here, the trial court did not find a failure to follow the statutory procedures when the tract in dispute was annexed to the Oklahoma City District. Nor did the trial court find that the boundary was created arbitrarily or capriciously. Rather, the trial court changed the school district boundary because it found that "the equities strongly favor the plaintiffs." This finding exceeded the court's authority.

## II.

### IF STATUS AS DE FACTO STUDENTS HAS BEEN ATTAINED, EQUITABLE ESTOPPEL MAY PRECLUDE TRANSFER.

The district court's judgment was erroneous because the proper method of changing a school district boundary is provided by 70 O.S.1985 § 7–101. However, the resolution of this student transfer dispute is governed by our recent holding in *Burdick v. Independent School District*, 702 P.2d 48 (Okla.1985).

*Burdick* involved a controversy over the boundary line between these same two school districts. In *Burdick*, both districts informed the potential buyer that the home for sale was located in the Mid-Del District. Relying on the representations of the districts, Mrs. Burdick purchased a home and enrolled her children in the Mid-Del schools. Five years later, Mrs. Burdick was notified that her home was located in the Oklahoma City District, and that her children could no longer attend the Mid-Del Schools. This Court affirmed the trial court, finding: 1) that the school districts were estopped from transferring the students based on the mother's detrimental reliance on the assurances of each of the school districts; and 2) that the records did not clearly reveal the school district in which Mrs. Burdick's home was located.

The facts here, and in *Burdick*, are quite similar. In 1980, these children were enrolled in Mid-Del Schools, and attended those schools without challenge until 1984. At trial, some of the parents testified that the Mid-Del and Oklahoma City School Districts had been asked what school district the children should attend, and that both districts had replied—Mid-Del. The Mid-Del school buses ran in front of their homes, and took their children to school. However, the Oklahoma City District I–89 buses bypassed Sun Country Estates, never servicing the area. The homeowners voted in Mid-Del school district elections,

---

**2.** *Tryon Dependent S.D. No. 125 of Lincoln County v. Carrier*, 474 P.2d 131, 133–34 (Okla. 1970).

**3.** The Okla. Const. art. 13, § 1 provides:
"The Legislature shall establish and maintain a system of free public schools wherein all the children of the State may be educated."

**4.** *Davis v. Bandemer*, — U.S. —, —, 106 S.Ct. 2797, 2804, 92 L.Ed.2d 85, 98 (1986); *INS v. Chadha*, 462 U.S. 919, 941, 103 S.Ct. 2764, 2779, 77 L.Ed.2d 317, 338 (1983); *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663, 686 (1962).

**5.** *Tryon Dependent S.D. No. 125 of Lincoln County v. Carrier*, see note 2, supra; *In re Wickstrum*, 454 P.2d 660, 664 (Okla.1969); *Okla-*

*homa Farm Bureau v. State Board of Education*, 444 P.2d 182, 187 (Okla.1968); *Hatfield v. Jimerson*, 365 P.2d 980, 983 (Okla.1961).

**6.** *Tryon Dependent S.D. No. 125 of Lincoln County v. Carrier*, note 2, supra.

**7.** *Spearman v. Williams*, 415 P.2d 597, 600 (Okla.1966); *Gates v. Easter*, 354 P.2d 438, 441 (Okla.1960); *School Dist. No. 25 of Woods County v. Hodge*, 199 Okl. 81, 183 P.2d 575, 597 (1947).

**8.** *In re Wickstrum*, see note 5, supra; *Musick v. State*, 185 Okl. 140, 90 P.2d 631, 634 (1938).

and their eligibility to vote has never been questioned. As had the homeowners in *Burdick,* the homeowners here, after full and truthful disclosure, entertained an honest belief, kindled and acquiesced in by the Mid-Del and the District I–89 officials, that they lived in the Mid-Del school district; and their children continuously attended Mid-Del schools for a considerable period of time without objection from either school.

Under *Burdick,* these students have attained the status of *de facto* students of the Mid-Del school district.[9] Ordinarily, estoppel and laches cannot be asserted against the state, its political subdivisions or agencies, unless the application furthers a public policy or a public interest.[10] The *Burdick* teaching is that the attainment of *de facto* status serves to overcome the general statutory requirement that students attend schools in the district where they reside. This is based, not on a strict construction of the statute, but on the broad public interest favoring scholastic continuity in a school district, where residential status has been honestly established and maintained openly, without an intervening change in the district's legal boundaries. The protection of such status involves sufficient public policy considerations to estop transfer of the *de facto* students who are currently enrolled, or their siblings[11] who may be enrolled, in the Mid-Del Schools.

### AFFIRMED IN PART; REVERSED IN PART.

**9.** *Burdick v. Independent School District,* 702 P.2d 48, 53 (Okla.1985).

**10.** *Board of Ed. of Ind. Sch. D. No. 48, Hughes County v. Rives,* 531 P.2d 335, 337 (Okla.1974).

**11.** Title 70 O.S.1981 § 8–102 provides in pertinent part:
"The county superintendent of schools shall grant an application for transfer of a child from the district in which he resides to another school district furnishing instruction in the grade he is entitled to pursue if such transfer has the approval of the boards of education of the sending and receiving districts. A student granted a transfer during the 1972–73 school year, or any school year thereafter, may continue to attend the school to which he transferred with approval of the receiving district

HODGES, SIMMS, OPALA, WILSON and SUMMERS, JJ., concur.

DOOLIN, C.J., HARGRAVE, V.C.J., and LAVENDER, J., concur in part and dissent in part.

DOOLIN, Chief Justice, concurring in part; dissenting in part, with whom HARGRAVE, V.C.J., and LAVENDER, J., join.

A majority of the Court in Part I of the opinion correctly recognizes that the drawing of school district boundaries is statutory, not equitable, and that a court may not redraw school district boundaries based on equitable considerations. In Part II of the opinion, however, the Court, in its rush to do equity overlooks our previous finding that student transfers are also statutory[1] under 70 O.S.1981, § 8–102,[2] and no transfer may be granted if the statutory grounds are not satisfied.[3] By extending the *Burdick*[4] doctrine to the facts of this case, the Court does indirectly what it cannot do directly, and leaves school transfer statutes in limbo.

We found in *Burdick* that the *de facto* status of children enrolled in the wrong school district proves no basis per se for their continued attendance in a school in which they are not legally qualified for enrollment. Their enrollment must be coupled with the parents' honest belief, kindled and acquiesced in by officials of both school districts, that they live in the district in which their children have mistakenly been enrolled. Further, the children must

only, and any brother or sister of such student may attend such school with approval of the receiving district only, provided that this provision shall not apply to emergency transfers or pupils transferred for the purpose of attending classes in special education ..."

**1.** *Board of Education of Independent School District No. 48 of Hughes County v. Rives, supra,* Note 10 of the majority opinion, at 336.

**2.** 70 O.S.1981, § 8–102, *supra,* note 11 of the majority opinion.

**3.** *Hughes County, supra,* Note 1, at 337.

**4.** *Burdick v. Independent School District, supra,* Note 9 of the majority opinion.

have attended the wrong schools for a considerable period of time without objection from either school district.[5] Only when all these factors, viewed in combination, are satisfied will the student's *de facto* status overcome the general aim of the law to place students in the schools of the district in which they reside.[6]

In *Burdick* the parents detrimentally relied on the affirmative misrepresentations of both the Mid-Del and District I–89 officials that the homes they were purchasing were in the Mid-Del school district. Such was not the case here. An attempted swap of the two parcels of land in July of 1980 between the Mid-Del and I–89 districts occurred before the first home was sold to any of the parents here and before any of the children residing in these homes were enrolled in the Mid-Del schools. The I–89 officials expressly told the Mid-Del district and the developer that the land was platted in the I–89 District. No misrepresentations were made by I–89 to any of these parents. If the parents were misled, the record is clear it was by Mid-Del and Gary Spencer. It is true that I–89 did not object to these children being enrolled in the Mid-Del Schools from August of 1980 until September of 1983, but that does not mean I–89 acquiesced in the illegal student enrollment—I–89 simply did not know of the enrollment until, quite by accident, they were notified by the Mid-Del Superintendent. Thereupon I–89 promptly lodged a protest and notified the parents that their children would be required to enroll in the I–89 schools for the next school year. Therefore, the *Burdick* requirements that both school districts mislead the parents, that the parents rely on the misrepresentations of both school districts, and that the school district in which the children should have been enrolled acquiesce in the arrangement, have not been met.

Under today's ruling, a school district now has the affirmative duty of sending fence riders out daily to see if any adjoining school district has cut the wire and rustled their students. To do otherwise

raises the possibility that estoppel and laches can be applied against the school district. No longer can a school district rely on the good faith of the adjoining district to refrain from invasion of its territory. Furthermore, I–89 was prepared to compromise on this controversy at trial by permitting transfer of the affected students, but the parents and Mid-Del rejected this compromise. Such an offer of compromise by the I–89 officials at trial cannot after the fact, be evidence creating estoppel and laches. We should not now effect that compromise by creating a precedent which turns the transfer statutes into complete shambles. I, therefore, dissent.