OPINION OF THE COURT
Edward J. Greenfield, J.
Plaintiff, Ultra Scope International, Inc. (Ultra), moves pursuant to CPLR 3212 for summary judgment on its first or second causes of action pursuant to an irrevocable letter of credit, No. imp-026260, and amendments made thereto issued by defendant, Extebank. Defendant cross-moves for a default judgment on its counterclaim.
The salient facts are as follows:
Raul Blanco, Ltd. (RBL) entered into a contract with Ultra to purchase ladies garments, fabrics and trims manufactured by Ultra in Korea. The terms of the contract required RBL to pay for the goods after it took delivery thereof in New York. *119 On January 23, 1989, upon the application of RBL, Extebank opened, for the benefit of Ultra, an irrevocable letter of credit in the amount of $750,000 (hereinafter Opening Letter of Credit) expiring on July 15, 1989. Ultra was notified of the Opening Letter of Credit by means of a telex transmitted to Cho Hung Bank (CHB) (the advising bank). The Opening Letter of Credit was, by its own terms, made subject to the Uniform Customs and Practice for Commercial Documentary Credits (1983 Revision), ICC Brochure No. 400 (hereinafter UCP) which under New York law, supersedes the Uniform Commercial Code (UCC 5-102 [4]). The Opening Letter of Credit required Extebank to pay sight drafts drawn on Extebank accompanied by certain documents.
The Opening Letter of Credit was amended five times by Extebank and remained in effect between January 23, 1989 and July 15, 1991 during which time the amount of the credit was increased from $750,000 to $800,000.
In its final form after amendment, the Opening Letter of Credit together with its amendments (hereinafter Final Letter of Credit) required Extebank to pay sight drafts drawn on Extebank prior to July 15, 1991 accompanied by the following:
1. commercial invoice in triplicate;
2. delivery receipt signed by an employee of RBL.
Pursuant to the Final Letter of Credit, Extebank was obligated to pay Ultra the sum of its sight draft upon delivery of the documents referred to above. Ultra delivered to and Raul Blanco accepted the goods. However, Raul Blanco failed to pay, thereby requiring Ultra to draw against the Final Letter of Credit.
On or about December 17, 1990, Ultra delivered to Extebank the documents required by the Letter of Credit together with a sight draft in the amount of $378,704.08. Eleven days later, by telex dated December 28, 1990, Extebank attempted to dishonor said draft for the following reasons:
1. stale date;
2. final destination omitted on invoice No. 1601;
3. cartage charge not authorized under the Letter of Credit.
On or about July 11, 1991, Ultra resubmitted to Extebank
(through the advising bank) the documents, corrected in accordance with the December 28, 1990 telex, together with a sight draft in the amount of $376,784.08, having deducted the cartage charge. Plaintiff resubmitted the same delivery receipt *120 and commercial invoices. After a six-day delay, which resulted in the Final Letter of Credit expiring on July 17, 1991, Extebank telexed Ultra to advise that it was again dishonoring the draft drawn on the Final Letter of Credit. The telex stated that the applicant refused the documents because they were "stale.”
Plaintiff commenced the instant action seeking damages in the amount of $378,704.08 (first cause of action) or alternatively $376,784.08 (second cause of action). It now seeks summary judgment based upon the Final Letter of Credit issued to it (second cause of action) or alternatively based upon the fourth amended Letter of Credit (first cause of action). It argues that Extebank’s arguments of mistake and fraud and/ or lack of good faith are without merit and accordingly it should be awarded summary judgment. Alternatively, it argues that Extebank’s lengthy delay in dishonoring the draft rendered the dishonor ineffective and that even if defendant may have had a defense to honoring the Letter of Credit, it should now be precluded from presenting it.
Summary judgment is proper where the only question is the interpretation of a written agreement (Long Is. R. R. Co. v Northville Indus. Corp., 41 NY2d 455 [1977]; Kuehne & Nagel v Baiden, 36 NY2d 539 [1975]).
It is well settled in New York that a letter of credit constitutes "a separate contract between the issuing or confirming bank and the beneficiary, independent of the contract for the sale of goods between the buyer and seller” (Fertico Belgium v Phosphate Chems. Export Assn., 100 AD2d 165, 172 [1st Dept 1984]). It is a "commitment on the part of the issuing bank that it will pay a draft presented to it * * * under the terms of the credit [and if it is a documentary draft] upon presentation of the required documents of title”. (Fertico Belgium v Phosphate Chems. Export Assn., supra, at 172; United Bank v Cambridge Sporting Goods Corp., 41 NY2d 254.)
The law in New York is clear; to draw on a letter of credit, the beneficiary need only establish that it has strictly complied with its essential requirements (Banque Worms v Banque Commerciale Privee, 679 F Supp 1173 [SD NY 1988]; Marino Indus. Corp. v Chase Manhattan Bank, 686 F2d 112, 114 [2d Cir 1982]). Plaintiff herein maintains that its second submission of documents on July 11, 1991 was in strict compliance with the terms of the Letter of Credit and therefore it is *121 entitled to judgment on its second cause of action as a matter of law.
Extebank’s sole objection to the documents submitted on July 11, 1991 was that they were "stale”. The documents submitted pursuant to the Letter of Credit were a commercial invoice and a delivery receipt.
Under the UCP, the only documents which can become "stale” are categorized as "Transport Documents”. Although there is no definition or use of the term "stale dated documents” in the UCP (1983 Revision), the Commission of Banking Technique and Practice Meeting on April 19, 1988 (ICC Docs 470/520, 470/531) has opined that the notion of "stale documents” was previously part of the 1974 Revision of the UCP and was replaced by article 47 (a) which relates to "Transport Documents”. Indeed the Commission advised that the term "stale” should be considered "irrelevant” in credits not asking for transport documents.*
UCP article 47 (a) requires "Transport Documents” to be presented not later than 21 days after their date of issuance or they may be refused. All other documents are timely as long as they are presented prior to the expiration of the credit. "Transport Documents” are defined by the UCP as documents indicating contracts of carriage "issued by a named carrier or its agent”, evidencing "loading on board or dispatch or taking in charge” (e.g., Bill of Lading, Combined Transport Bill of Lading, FIATA FBL, FIATA FCR, Rail Consignment Note or Air Waybill) (UCP arts 25-34).
Therefore, any refusal by Extebank based on "stale dated documents” could only apply to article 47 (a) "Transport Documents”. However, none of the documents required by the Final Letter of Credit are "Transport Documents”. Neither the commercial invoice nor delivery receipt can be construed as a "Transport Document”.
*122 The commercial invoice is an accounting document and falls within its own category entitled "commercial invoices” as defined in UCP article 41. The delivery receipt is a document representing acceptance of possession of the goods by RBL and cannot be a "Transport Document” because it is not a contract of carriage issued by a named carrier.
The delivery receipt falls within the category of "Other Documents” (UCP ch D4) and is defined by UCP article 23 which states that all documents other than "commercial invoices” (UCP ch D3), "insurance documents” (UCP ch D2), or "Transport Documents” (UCP ch Dl) are "Other Documents”. "Other Documents” are those which are unique to the transaction and are required by the UCP to be defined in the letter of credit as to issuer, wording or date content. That the delivery receipt cannot be construed as a "Transport Document” is further supported by the opinion of the Commission of Banking Technique and Practice Meeting on April 19, 1988 (ICC Docs 470/Int 240, 470/531) which determined that the term "Transport Document” only includes original and binding shipping documents. Therefore, it determined that the 21-day presentment period required by article 47 (a) was not applicable to a copy.
All documents other than "Transport Documents” are timely when presented before the expiration of the letter of credit. Neither the "Commercial Invoice” nor "Delivery Receipt” are "Transport Documents” and since both were submitted to Extebank on July 11, 1991, prior to the expiration of the Final Letter of Credit, they were timely.
Thus, plaintiff has made out its prima facie case and has shown its entitlement to summary judgment on its second cause of action (Banque Worms v Banque Commerciale Privee, 679 F Supp 1173 [SD NY 1988], supra).
Defendant, however, raises several defenses to the enforcement of the Final Letter of Credit. Extebank alleges in paragraphs 33 through 40 of its answer that a December 13, 1990 telex that purported to extend the expiration date of the Letter of Credit to July 15, 1991 in response to RBL’s request was transmitted by mistake by "an issuance clerk” of the letter of credit department.
Defendant has asserted this argument of mistake as both an affirmative defense and a counterclaim. By way of counterclaim, defendant seeks the return of the telex and any other writings that embody a right to draw on the Letter of Credit at any time after January 15, 1991.
*123 Since Ultra failed to serve a reply, Extebank argues it is now entitled to a default judgment on this counterclaim of mistake. Ultra attributes its failure to respond partially to law office failure and partially to the fact that the counterclaim was a sole hybrid which was asserted among nine affirmative defenses. Ultra submits a reply in its opposition papers addressing the issue on its merits.
The extreme sanction of a default judgment is not warranted in this instance as defendant has failed to show how plaintiffs inadvertence has caused it prejudice and the omission was corrected by plaintiff upon the first mention thereof to plaintiff. (Berman v Szpilzinger, 172 AD2d 304 [1st Dept 1991]; see also, Stevenson Corp. v Dormitory Auth., 112 AD2d 113, 116 [1st Dept 1985].) It is a “fundamental policy of New York jurisprudence — except in the rarest of cases, disputes should be decided on the merits” (supra, at 116).
Accordingly, plaintiffs omission is excused and defendant’s cross motion is denied.
As to the merits of Extebank’s argument, it is well settled that unilateral mistake alone is insufficient basis for rescission (Surlak v Surlak, 95 AD2d 371 [2d Dept 1983]). In order to be entitled to rescind a contract, there must be evidence of “mutual mistake”. ”[T]o overcome the heavy presumption that a deliberately prepared and executed written instrument manifested the true intention of the parties, evidence of a very high order is required * * * It follows that a petitioning party has to show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties * * * the evidentiary requirement * * * 'forbids relief whenever the evidence is loose, equivocal or contradictory’ ” (Backer Mgt. Corp. v Acme Quilting Co., 46 NY2d 211, 219-220 [1978] [citations omitted]).
Extebank fails to submit an affidavit of the issuance clerk it contends made the careless mistake of transmitting the telex (fifth amendment) to CHB. Nor does it submit an affidavit of anyone else with personal knowledge of the mistake.
By affidavit of the officer of its credit department during the time in question, Orlando Lorenzo, it contends only that Extebank made a mistake, not that there was any mistake by plaintiff.
Further, Lorenzo’s attempt to show that plaintiff knew or should have known of his clerk’s "mistake” at the time of receipt is based on loose, equivocal language and is contra- *124 dieted by his admission that "most such applications do get approved”. Also, Lorenzo’s claim that the redacted telex dated January 4, 1991 conveyed his "intention * * * to the bankers at CHB that something had gone wrong” with the Letter of Credit is contradicted by the fact that an error is not mentioned in the telex but instead it requests Ultra’s consent to cancel the Irrevocable Letter of Credit pursuant to UCP article 10 (d).
For all of the foregoing reasons, the court finds Extebank’s opposing papers on this issue defective. Accordingly, defendant’s sixth and seventh affirmative defenses and counterclaim are dismissed.
Joseph Apicella,
defendant’s present lending officer, attempts to construct a claim of fraud and conspiracy between Ultra and RBL by reference to a June 12, 1991 agreement between Ultra and RBL which sets forth terms for continuing cash basis transactions between the parties. Apicella took over the RBL account in mid-December of 1990 after the previous account officer was discharged. Apicella contends that the June 12, 1991 agreement was entered into "for the precise purpose of inducing Extebank to lend more money to RBL” well after the underlying goods were received by RBL and that "Extebank was an intended beneficiary of that agreement” and finally that "Ultra agreed to subordinate to Extebank $600,000 in unpaid invoices reflecting 1990 sales”. Further, "Ultra stood silently for six months while it benefitted from Extebank’s continuing loans to RBL” knowing that RBL would file a petition for bankruptcy. Apicella explains that Extebank has not been fully paid by RBL and Extebank will certainly never be fully paid if it is now required to satisfy an Ultra claim against RBL that Ultra voluntarily subordinated.
In order to establish one’s rights as an intended third-party beneficiary of a contract one must establish " '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost’ ”. (Castorino v Unifast Bldg. Prod. Corp., 161 AD2d 421, 422 [1st Dept 1990], quoting Burns Jackson Miller Summit & Spitzer v Lindner, 59 NY2d 314, 336 [1983].) " 'It is well settled that before a third party can enforce a contract in his favor it must clearly appear that the contract was made and intended for his benefit * * * [t]he agreement under which the third party *125 claims must clearly express an intention to assume a duty directly to him.’ (10 N. Y. Jur., Contracts, §239, pp. 160, 162.)” (Resinol v Valentine Dolls, 14 AD2d 853 [1st Dept 1961].) "A party, claiming to be a third-party beneficiary, has the burden of demonstrating that he has an enforceable right.” (Airco Alloys Div. v Niagara Mohawk Power Corp., 76 AD2d 68, 79 [4th Dept 1980].) Defendants have failed to meet their burden as Extebank is not mentioned in the June 12, 1992 agreement nor is the Letter of Credit mentioned anywhere in the agreement.
Moreover, even if Extebank could claim rights under the June 12, 1991 agreement, Extebank also cannot, under these circumstances, claim fraud in the transaction as any such alleged "fraud” would be collateral to the Irrevocable Letter of Credit and as such is not a defense to proper performance of a letter of credit contract. (Banque Worms v Banque Commercial Privee, 679 F Supp 1173 [SD NY 1988], supra.)
While it is true that "[Qraud in the transaction represents a narrow exception to the independence principle” (Banque Worms v Banque Commerciale Privee, 679 F Supp 1173, 1182 [SD NY 1988], supra), it is limited to situations in which the wrongdoing of the beneficiary has permeated the entire transaction (see, Emery-Waterhouse Co. v Rhode Is. Hosp. Trust Natl. Bank, 757 F2d 399 [1st Cir 1985] [where attempts to draw on standby Letter of Credit when known that nothing owed deemed fraudulent]; Itek Corp. v First Natl. Bank, 730 F2d 19, 25 [1st Cir 1984] [attempt to draw on standby when there was "no plausible or colorable basis under the contract” deemed fraudulent]).
The rationale behind limiting the fraud defense to only those cases in which the fraud permeates the entire transaction is "[i]f the letter of credit is to remain a viable tool of commerce, fraud in a collateral transaction cannot justify a refusal to pay” (Banque Worms v Banque Commerciale Privee, 679 F Supp 1173, 1182 [SD NY 1988], supra). "[0]ne of the expected advantages and essential purposes of a letter of credit is that the beneficiary will be able to rely on assured, prompt payment from a solvent party; necessarily, a part of this expectation of ready payment is that there will be a minimum of litigation and judicial interference, and this is one of the reasons for the value of the letter of credit device in financial transactions.” (New York Life Ins. Co. v Hartford Natl. Bank & Trust Co., 173 Conn 492, 499, 378 A2d 562, 566 [1977].)
*126 In this action, in contrast to the aforementioned cases, it is undisputed that the amount sought by Ultra for goods RBL received is owed under the parties’ primary contract. That Extebank can assert that the June 12, 1991 agreement Ultra entered into with RBL nearly six months after the fifth amended Letter of Credit was issued by Extebank and which Extebank concedes is a "secondary or tertiary contract” permeated the Letter of Credit in any way is beyond credulity. Further, Extebank’s assertions of reliance on this agreement are rebutted by Apicella’s admission that Extebank’s counsel first obtained a copy of this agreement through discovery proceedings in other litigation and that it was only sometime after it answered the complaint herein on October 9, 1991.
Thus, the court finds Extebank’s intended third-party beneficiary, lack of good faith and fraud defenses to be without merit.
Accordingly, the third and eighth affirmative defenses are dismissed.
The court also finds that defendant’s assertion in sections 29 through 32 and 52 through 53 of its answer and paragraphs 9 through 19 of Apicella’s affidavit fail to show that plaintiff in any way waived its right to collect under the Irrevocable Letter of Credit. On the contrary, plaintiff’s submission and resubmission on December 17, 1990 and July 11, 1991 respectively indicate an intent to act on its rights.
Accordingly, the ninth affirmative defense alleging waiver, estoppel and/or ratification is dismissed.
Finally, defendant’s claim that "the last Extebank heard, CHB had purchased Ultra’s drafts and documents” is not supported by the exhibits and is refuted by both Lorenzo and Apicella’s reference throughout their affidavits to CHB as the advising bank.
Accordingly, defendant’s first affirmative defense is dismissed as without merit.
Defendant’s second affirmative defense is also without merit as plaintiff concedes it is pleading in the alternative.
Accordingly, as the court finds defendant’s affirmative defenses to the second cause of action to be without merit, it grants plaintiff summary judgment on its second cause of action.

 "The Commission is the body of expert practitioners within the ICC which drew up these rules (UCP) nearly sixty years ago, and which is responsible for up-dating them from time to time to allow for the changes and developments in procedures, transport and communications which affect international trade. The Banking Commission — meeting twice yearly considers queries raised by commercial parties, carriers and forwarders, insurers and bankers regarding provisions of the Uniform Customs and Practice (UCP), giving its opinions for the guidance of interested parties. These opinions are widely read and taken note of, although they do not have legal force.” (Intl Chamber of Commerce, Opns ICC Banking Commn 1987-1988, Publ No. 469, at 3.)